**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 3, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1901**

Cir. Ct. No. **2022CV512**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

JENNIFER MUNNIK, JOSEPH BONELLI, SCHWIEBL HOLDINGS, LLC, PALATINE RESORT PROPERTIES, LLC, NEIL BIALK, SUE BIALK, THOMAS ATKINS AND JOYCE ATKINS,

    PLAINTIFFS-APPELLANTS,

  V.

BLUE HARBOR RESORT CONDOMINIUM ASSOCIATION, INC., SHEBOYGAN RESORT OPERATOR LLC AND SHEBOYGAN ACQUISITIONS LLC,

    DEFENDANTS-RESPONDENTS,

WEST BEND MUTUAL INSURANCE COMPANY,

    INTERVENOR.

---

        APPEAL from an order of the circuit court for Sheboygan County: REBECCA L. PERSICK, Judge. *Affirmed*.

        Before Neubauer, P.J., Grogan, and Lazar, JJ.

¶1    LAZAR, J. The appellants (Unit Owners),[1] a group of condominium owners with units in the Blue Harbor Resort Condominium Association, Inc. (Blue Harbor) appeal the circuit court's order granting summary and declaratory judgment to respondent Blue Harbor declaring that certain occupancy restrictive covenants contained in its Declaration and Amended Restrictive Covenant are valid and enforceable. The Unit Owners assert that the occupancy restrictions are ambiguous and violate Wisconsin condominium law, or in the alternative that, when read in conjunction with the City of Sheboygan's Building Code (Building Code), are prohibited as a matter of law. Blue Harbor disputes both arguments and contends that the covenants and the concurrent use restrictions are reasonable, valid, and enforceable. We agree and affirm.

## BACKGROUND

¶2    In order to understand the issues on appeal, it is necessary to first set forth how this condominium project arose. On July 30, 2003, the City of Sheboygan (City), through its Redevelopment Authority, along with the Great Lakes Companies, Inc., Blue Harbor Resort Sheboygan, LLC, and Blue Harbor, entered into a Development Agreement to develop Blue Harbor resort, hotel, convention center, and water park in downtown Sheboygan. As part of the resort complex, Blue Harbor, a 64-unit condominium (contained in 16 separate

---

[1] The appellants, a group of Blue Harbor Resort Condominium Association, Inc. unit owners, are Jennifer Munnik, Joseph Bonnelli, Schweibl Holdings, LLC, Palatine Resort Properties, LLC, Neil Bialk, Sue Bialk, Thomas Atkins, and Joyce Atkins. For ease of reference, they are collectively referred to as the Unit Owners. These parties own five of the 64 Blue Harbor condominium units.

Respondents include Blue Harbor and Sheboygan Resort Operator LLC (SRO) and Sheboygan Acquisitions LLC (SA). SRO and SA own and/or manage a majority of the Blue Harbor condominium units.

buildings), was designed to be occupied by owners and their guests only for periods of time not to exceed 29 consecutive days. This was to "encourage" transient residential use and allow for the condominium units to be used by Blue Harbor visitors and water park guests.

¶3 A 29-day occupancy restriction was placed in the Declaration, executed on June 24, 2004, which was acknowledged and agreed to by each condominium unit owner prior to purchase.[2] The Declaration's restrictive provision provides as follows:

> 12.1 Use. Declarant, each Unit Owner, and their respective agents, representatives, guests, tenants and invitees *shall be subject to the use restrictions* set forth in this Declaration and the Condominium Documents including, but not limited to, the Rules and Regulations as amended from time to time, which such restrictions include, without limitation, (i) *the restriction imposed by the City's building code in effect on the date of this Declaration that no individual may continuously occupy a Unit for a period exceeding 29 days*, and (ii) the restriction that the Building and Units are intended for and restricted exclusively to residential uses; provided, however, that Declarant reserves the right to use each of the unsold Units as a sample, model or sales office or management office for the Condominium.

(Emphases added.)

¶4 The South Pier District Restrictive Covenants and Cross Easement Agreement regarding the Blue Harbor units, originally executed on July 30, 2003,

---

[2] The Unit Owners point to an earlier document that reflected prior occupancy restrictions which could exceed the 29-day occupancy restriction, to wit, the South Pier District Restrictive Covenants and Cross Easement Agreement, dated July 30, 2003. That document was superseded by the Declaration of the Blue Harbor Resort Condominium, which also expressly amended the Restrictive Covenant, both of which documents declare that there is a 29-day residential occupancy restriction for unit owners. This earlier document is not relevant to this appeal other than for historical perspective.

was amended on June 25, 2004 (hereinafter the Amended Restrictive Covenant). The Amended Restrictive Covenant, the pertinent document in this appeal, also contained a 29-day occupancy residency restriction:

> 7. **Building Code Compliance.** The following is added as a new Section 6(h) in the Original Restrictive Covenants: "The condominium units have been constructed to comply with the City of Sheboygan's building codes applicable to transient lodging. *In order to comply with the City of Sheboygan's building codes, no individual may continuously occupy any particular condominium unit for a period exceeding 29 days.* Any use of a condominium unit for any purpose other than as transient lodging will violate the City of Sheboygan's building codes and the City of Sheboygan shall have all rights and remedies available to it in connection with such violation, including without limitation, the right to require the owner of any such unit to bring his/her/its condominium unit into compliance with all applicable building codes. The issuance by the City of Sheboygan of an occupancy permit for any condominium unit shall not be deemed to limit or restrict the City of Sheboygan's right to enforce its building codes and ordinances or its right to require any condominium unit owner to comply with such building codes and ordinances."

(Emphasis added). The covenants in the Amended Restrictive Covenant "run with the land" and "shall inure to the benefit of and be binding upon the permitted successors and assigns of the parties."

¶5      The State of Wisconsin and the City approved occupancy of the Blue Harbor condominiums under the R-1 Transient Residential Use zoning designation. The City has no records that indicate approval of designations other than R-1 for Blue Harbor. The Building Code, in effect in June 2004, replicated the 2002 Wisconsin Enrolled Commercial Building Code. In Section 310.01, it defines residential occupancy as follows:

> **Residential Group R.** Residential Group R occupancy includes, among others, the use of a building or structure, or a portion thereof, for sleeping accommodations, when

not classed as an Institutional Group I. Residential occupancies shall include the following:

> **R-1** Residential occupancies where the occupants are primarily transient in nature (less than 30 days) including:
> > Boarding houses (transient)
> > Hotels (including motels)

> **R-2** Residential occupancies containing more than two dwelling units where the occupants are primarily permanent in nature, including:
> > Apartment houses
> > Boarding houses (not transient)
> > Convents
> > Dormitories
> > Fraternities and sororities
> > Monasteries

¶6 When submitting a building plan for approval under the Building Code, the individual or entity must obtain an occupancy classification based upon the building's intended use. The occupancy classification for Blue Harbor is, and has always been, R-1 Transient Residential. The parties agree the final, stamped construction drawings for Blue Harbor and the building permits indicate an R-1 occupancy classification. Finally, the conditional approval from the Wisconsin Department of Commerce lists the units' occupancy as "R-1 Transient Residential."

¶7 All of the Blue Harbor units were occupied as transient residential units from the date they were built through this lawsuit. But, it appears that not all of the condominium unit owners were happy with the bargain they struck regarding limited occupancy. Following discussions in late 2020 with the City, Blue Harbor (under a Board that was not yet aligned with SRO and/or SA) requested a waiver and release of the 29-day occupancy restriction from the City and its Redevelopment Authority. The Board did not take a vote of the owners of

the units before it reached out to the City. The Redevelopment Authority ultimately voted, in April 2021, in favor of waiving and removing the 29-day occupancy restriction and "authoriz[ing] Staff to modify any necessary documents to accomplish that waiver/release."

¶8 Nothing more happened with this waiver and release.[3] There is no evidence in the Record to indicate that, at any time following that meeting, the Redevelopment Authority or the City modified any necessary documents to effectuate the vote.

¶9 Around the same time the former Board was pursuing this waiver, some condominium owners began listing their units for sale as "owner-occupied units[.]" Cognizant of the waiver attempt, and, that the Board of Directors for the condominium association was not enforcing the transient occupancy restriction, SRO and SA brought these concerns to the Board and, on October 7, 2021, filed a Notice of Claim pursuant to WIS. STAT. § 893.80(1d)(a) and (b), "seeking a declaration that the 29-Day [Occupancy] Restriction is enforceable ... ." The Board wrote a letter to the condominium owners in December 2021 asserting that it had concluded that the 29-day occupancy restriction "artificially reduced the value of the units and prevented the normal market for sales of real estate." The Board, in the letter, affirmatively stated:

> In the process of reviewing the 29-day Rule, the Board, the City, and legal counsel for both discovered that the alleged 29-day Rule was an implicit restriction instead of an actual restriction and that the 29-day Rule was predicated or

---

[3] Contrary to the assertions of the Unit Owners in the circuit court, we cannot find support in the Record for the statement that "[t]he Redevelopment Authority and its building inspector agree that there is no restriction imposed by the building code limiting continuous occupancy."

preconditioned on units not also being in compliance with owner-occupied residential building codes.

¶10 Following that December 2021 letter from the Board, its composition was changed, and new Board members were voted into office.[4] A special meeting of condominium owners led by the new Board was held in August 2022, at which time the Board announced that it would be enforcing the condominium restrictions set forth in its documents, including the 29-day occupancy restriction.

¶11 The Unit Owners filed a complaint in circuit court in October 2022, seeking a declaration and injunction that the 29-day occupancy restriction is no longer valid and enforceable.[5]

¶12 In November 2023, Blue Harbor moved the circuit court for summary and declaratory judgment. SRO and SA joined those motions. The same day as Blue Harbor's motion, the Unit Owners filed their motion for summary judgment. The court initially denied both motions in an oral ruling on January 23, 2024, but it allowed further briefing on two questions: (1) "were the condos always designated R1 or R2[,]" and (2) "even if they were only R1, ... whether the Code prohibits occupancy because the language in the Code reads that R1 applies primarily, not exclusively, but primarily to transient occupancy." In

---

[4] The Record is not clear when the new Board members (who were more aligned with SRO and SA's view on occupancy) were voted on to the Board, but the Minutes of the Special Meeting of Unit Owners, held on August 23, 2022, indicates that there was an Annual Meeting of the Association held on May 23, 2022. It can be assumed that the new Board members were elected at the Annual Meeting.

[5] The complaint was amended several times. West Bend Mutual Insurance Company's motion to intervene was granted, but the circuit court, finding it had a duty to defend, denied West Bend's motion for summary judgment on that issue.

sum, the court found[6] that it was a question of fact as to "whether the restriction actually applied at the time of the creation of the condos." The parties sought and were given permission to file supplemental briefs and affidavits. The matter was set for another oral ruling in June 2024.

¶13 During its final oral ruling, the circuit court relied primarily upon the City Planner's affidavit, which indicated that the condominium buildings were only approved as R-1 Transient Residential, and that such occupancy is for fewer than 30 days. The court, noting that it was not concerned if the units could have also been designated as R-2 residential occupancy when built, denied the first argument of the Unit Owners' motion. It denied the second argument of the Unit Owners' motion with respect to condominium laws by explaining that "it's pretty common for condos that are part of resort communities to have those types of occupancy limitations."[7]

¶14 The circuit court memorialized its final oral ruling in a written order entered on August 6, 2024, in which it granted Blue Harbor's motion, denied the Unit Owners' motion, and dismissed the Unit Owner's complaint on the merits, with prejudice. The court made several declarations, including that: the 29-day occupancy restriction in the Condominium Declaration is valid and enforceable (regarding Section 12.1), and the 29-day occupancy restriction in the Amended Restrictive Covenant is valid and enforceable (regarding Section 6(h)).

---

[6] The circuit court found that "the 29-day occupancy restriction is tied to the City's Building Code[,]" and concluded "that if the Code limiting occupancy did apply in 2004, the fact that it no longer applies does not change the declaration or the cross easements."

[7] The circuit court issued a second written order on that same date that also granted Blue Harbor's motion and denied the Unit Owners' motion; that order, however, did not contain the declarations.

¶15    The Unit Owners timely appealed.

## STANDARD OF REVIEW

¶16    Interpretation of a statute or condominium documents presents questions of law which we review de novo. *Apple Valley Gardens Ass'n, Inc. v. MacHutta*, ("*Apple Valley Gardens II*"), 2009 WI 28, ¶12, 316 Wis. 2d 85, 763 N.W.2d 126; *DOR v. Menasha Corp.*, 2008 WI 88, ¶44, 311 Wis. 2d 579, 754 N.W.2d 95.  "We also independently review whether the language employed in a restrictive covenant is ambiguous."  *Nordstrom v. Kane*, 2021 WI App 71, ¶15, 399 Wis. 2d 522, 966 N.W.2d 91.

¶17    We review a circuit court's summary judgment decisions de novo, "applying the same method employed by the [circuit] court."  *Koepsell's Olde Popcorn Wagons, Inc. v. Koepsell's Festival Popcorn Wagons, Ltd.*, 2004 WI App 129, ¶2, 275 Wis. 2d 397, 685 N.W.2d 853.   "[S]ummary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *M & I First Nat'l Bank v. Episcopal Homes Mgmt., Inc.*, 195 Wis. 2d 485, 497, 536 N.W.2d 175 (Ct. App. 1995); WIS. STAT. § 802.08(2).  "Generally, when both parties file cross-motions for summary judgment, it is the equivalent of a stipulation of facts permitting the case to be decided solely on the legal issues presented."  *Carlin Lake Ass'n, Inc. v. Carlin Club Props., LLC*, 2019 WI App 24, ¶19, 387 Wis. 2d 640, 929 N.W.2d 228.

## DISCUSSION

¶18    The Unit Owners present two arguments to this court.  First, they assert that the 29-day occupancy restriction, in and of itself, is a violation of

9

Wisconsin's condominium law and it violates their real property rights and concomitant rights to possess and use their condominium units for any lawful purpose. In support of this argument, the Unit Owners argue that the restrictive covenant is not only ambiguous, but is so unreasonable and absurd that it cannot be upheld. They next contend that the restriction should be invalidated because when it is read in conjunction with the Building Code, there is no provision for a required prohibition on continuous occupancy of the condominium units. We disagree.

¶19    Based upon its plain language, the terms of the 29-day occupancy restriction are not fairly susceptible to more than one reasonable interpretation; to the contrary the restriction is clear and unambiguous. It is, thus, valid and enforceable. The parties entered into their condominium purchase agreement contracts with their eyes wide open and with a full understanding that they were limited in how long they could continuously occupy their units so as to encourage visitors to the resort. The property was zoned and approved as R-1 Transient Residential. Merely because the zoning designation could be changed by the City does not alter the fact that the documents were valid when signed and were based upon the R-1 classification. Thus, neither of the Unit Owners' arguments has any merit, and the circuit court did not err when it granted summary and declaratory judgment in favor of Blue Harbor.

## I.  The restrictive covenant is valid and enforceable.

### A.  Ambiguity was not waived by the Unit Owners.

¶20    Blue Harbor first asserts that the Unit Owners belatedly raised the issue of ambiguity only in their appeal and that, per *Dalka v. American Family Mutual Insurance Co.*, 2011 WI App 90, ¶5, 334 Wis. 2d 686, 799 N.W.2d 923,

we should reject this argument out of hand. While it is correct that issues must be preserved below in order for this court to consider them on appeal, *State v. Huebner*, 2000 WI 59, ¶10, 235 Wis. 2d 486, 611 N.W.2d 727, the Unit Owners raised the issue of ambiguity in several of their briefs[8] which cited to related caselaw including *Nordstrom*, 399 Wis. 2d 522, ¶16, and *Zinda v. Krause*, 191 Wis. 2d 154, 170, 528 N.W.2d 55 (Ct. App. 1995).

¶21     Accordingly, the Unit Owners have preserved this issue for appeal, and we shall address it in full.

### B. There is no ambiguity in the restrictive covenant.

¶22     The Unit Owners contend that, while a condominium association may restrict the use of its units in ways that adversely impact the owners' property rights, such restrictions "must be expressed in clear, unambiguous, and peremptory terms" in order to be enforceable. *Nordstrom*, 399 Wis. 2d 522, ¶16 (citing *Forshee v. Neuschwander*, 2018 WI 62, ¶16, 381 Wis. 2d 757, 914 N.W.2d 643). The 29-day occupancy restriction, they assert, is "anything but clear in [its] intent" because it is tied to the Building Code, which, itself, contains additional ambiguous language. Blue Harbor responds that, for a restriction to be considered ambiguous (and thus subject to interpretation or being found unenforceable), specific language must be identified, and no such language was put forth by the Unit Owners.

---

[8] The concept of ambiguity was raised in the summary judgment motion brief, reply brief, and supplemental brief by the Unit Owners.

¶23    We agree.  In fact, the Unit Owners first pointed in their reply brief to specific language they allege is ambiguous.  That alone would warrant our dismissal of this argument.  *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (stating the court may decline to address arguments that are undeveloped).  However, we still are able to address this issue regardless of whether it was fully raised below or adequately briefed on appeal.  *See State v. Ortiz*, 2001 WI App 215, ¶¶11-13, 247 Wis. 2d 836, 634 N.W.2d 860.  Even when we consider the belated support for their first argument, the Unit Owners fail to establish any ambiguity in the restriction.

¶24    Before we consider the language at issue in this appeal, it is necessary to address the underlying condominium and property right laws.  "The public policy of the State of Wisconsin favors the free and unrestricted use of property."  *Nordstrom*, 399 Wis. 2d 522, ¶16.  Like any other parcel of real property, a condominium "unit, together with its undivided interest in the common elements, for all purposes constitutes real property."  WIS. STAT. § 703.04.  Accordingly, a condominium unit owner holds real property and has all the rights and privileges that go along with such ownership.  "There is no doubt that owners of real property have the right to use that property as they see fit ... .  That being said, this use-of-property right is not absolute ... ."  *Wildwood Estate, LLC v. Village of Summit*, 2025 WI App 47, ¶24, 418 Wis. 2d 22, 25 N.W.3d 581.

¶25    Wisconsin's statutes clearly permit a condominium association to include restrictions or limitations in its declaration.  WIS. STAT. § 703.09(1)(g).  Condominium declarations "shall contain" a "[s]tatement of the purposes for which the building and each of the units are intended *and restricted as to use*."  *Id.* (emphasis added).  The statutes further provide that all unit owners shall "comply strictly" with the "covenants, conditions[,] and restrictions" contained within the

condominium declaration. WIS. STAT. § 703.10(1). This is because the condominium "declaration is the instrument through which a property becomes subject to WIS. STAT. ch. 703, the Condominium Ownership Act, and which, when recorded with the plat, creates the condominium." *Apple Valley Gardens Ass'n, Inc. v. MacHutta*, ("*Apple Valley Gardens I*"), 2007 WI App 270, ¶12, 306 Wis. 2d 780, 743 N.W.2d 486, *aff'd*, *Apple Valley Gardens II*, 316 Wis. 2d 85.

¶26 "Condominium ownership is a statutory creation that obligates individual owners to relinquish rights they might otherwise enjoy in other types of real property ownership." *Apple Valley Gardens II*, 316 Wis. 2d 85, ¶17. A condominium owner is bound by the declaration, bylaws, and other legal documents creating their ownership. *Id.* A prospective owner is obligated to carefully read all of the terms and conditions that are contained within the condominium documents. *See Deminsky v. Arlington Plastics Mach.*, 2003 WI 15, ¶30, 259 Wis. 2d 587, 657 N.W.2d 411 ("Failure to read a contract ... is not an excuse that relieves a person from the obligations of the contract."); *Kanack v. Kremski*, 96 Wis. 2d 426, 432, 291 N.W.2d 864 (1980). Our supreme court recognizes that the caveat emptor (or "buyer beware") principle "broadly applies to the transfer of real estate interests ... ." *Brenner v. Amerisure Mut. Ins. Co.*, 2017 WI 38, ¶28, 374 Wis. 2d 578, 893 N.W.2d 193. That court explained that

> parties to a business transaction must "use their faculties and exercise ordinary business sense, and not [] call on the law to stand *in loco parentis* to protect them in their ordinary dealings with other business people."

*Id.*, ¶30 (citation omitted).

¶27 The law is clear that "[reasonable restrictions concerning use, occupancy[,] and transfer of condominium units are necessary for the operation

and protection of the owners in the condominium concept." *Apple Valley Gardens I*, 306 Wis. 2d 780, ¶21 (citation omitted). Thus, restrictions of some sort are permissible in condominium declarations.

¶28 Even the Unit Owners concede that a condominium association may restrict the use of its units. They note, as permissible, restrictions on pets, age, and rental to third parties. *See Apple Valley Gardens II*, 316 Wis. 2d 85, ¶31 (rental to third parties). The Unit Owners declare that *those* type of restrictions are enforceable, but that a time-limit restriction in a resort designed to provide housing for resort guests and where the units were sold with the understanding that they would be more akin to investment properties is not clear and unambiguous. We are hard-pressed to see how the clearly-stated limited-day restriction is not clear, direct, and to the point.

¶29 "[R]estrictive covenants are strictly construed to favor the unencumbered use of property." *Nordstrom*, 399 Wis. 2d 522, ¶16; *see Zinda*, 191 Wis. 2d at 165. Ambiguity in a document (such as the Declaration or Amended Restrictive Covenant) is only found when there is language that is "fairly susceptible to more than one reasonable interpretation." *Wilson Mut. Ins. Co. v. Falk*, 2014 WI 136, ¶24, 360 Wis. 2d 67, 857 N.W.2d 156 (citation omitted); *see Zinda*, 191 Wis. 2d at 165-66. "[W]e do not look for amorphous general intent, but rather, we determine the meaning of the restriction by the words actually used." *Nordstrom*, 399 Wis. 2d 522, ¶17 (quoting *Forshee*, 381 Wis. 2d 757, ¶17). "By intent we do not mean the subjective intent of the drafter, but the scope and purpose of the covenant as manifest by the language used." *Zinda*, 191 Wis. 2d at 166.

14

¶30 "Where the terms of a [document] are clear and unambiguous, we construe the [document] according to its literal terms." *See Tufail v. Midwest Hosp., LLC*, 2013 WI 62, ¶26, 348 Wis. 2d 631, 833 N.W.2d 586. "Thus, in order to be enforceable, a restriction that limits the free use of property 'must be expressed in clear, unambiguous, and peremptory terms.'" *Nordstrom*, 399 Wis. 2d 522, ¶16 (quoting *Forshee*, 381 Wis. 2d 757, ¶16). Under these principles, we conclude that the 29-day occupancy restriction is unambiguous and that its purpose—to encourage visitors to the Blue Harbor resort and to support an investment-owner strategy—is readily discernable from the words in the restriction.

¶31 The Unit Owners hang their ambiguity hat on a far-flung tree branch. They assert that the preface to the phrase in the Declaration "that no individual may continuously occupy a Unit for a period exceeding 29 days" qualifies that restriction in a manner that ties it to the Building Code.[9] We question why that matters. In and of itself, that does not make the restriction language ambiguous. To the contrary, that qualifying phrase appears to illustrate where the concept for the 29-day occupancy restriction arose. The reference to the Building Code (as it existed in 2004) does not alter the clarity of the 29-day occupancy restriction nor does it render that restriction ambiguous. It merely

---

[9] The "qualifying" phrase is highlighted below:

> 12.1 Use. Declarant, each Unit Owner, ... shall be subject to the use restrictions set forth in this Declaration ... including, ... (i) *the restriction imposed by the City's building code in effect on the date of this Declaration* that no individual may continuously occupy a Unit for a period exceeding 29 days ... .

(Emphasis added.)

offers an explanation for the precise timeframe by tying the limitation to the existing laws. The circuit court expressly found that the 29-day occupancy restriction *was* tied to the Building Code. We agree, but that is not a basis for lack of clarity.

¶32 Next, the Unit Owners complain that corresponding language in the Amended Restrictive Covenant is also ambiguous because that 29-day occupancy restriction is likewise "reliant upon the City's [B]uilding [C]ode[.]" They point to the following:

> 7. **Building Code Compliance.** ... "The condominium units have been constructed to comply with the City of Sheboygan's building codes applicable to transient lodging. *In order to comply with the City of Sheboygan's building codes*, no individual may continuously occupy any particular condominium unit for a period exceeding 29 days. Any use of a condominium unit for any purpose other than as transient lodging *will violate the City of Sheboygan's building codes and the City of Sheboygan shall have all rights and remedies available to it* in connection with such violation, including without limitation, the right to require the owner of any such unit to bring his/her/its condominium unit into compliance with all applicable building codes. ..."

(Emphases added.) The Unit Owners assert, again, that the restriction is tied to the Building Code and that in this provision it appears that the City has rights to enforce violations. Again, this argument misses the mark.

¶33 The Unit Owners do not explain why the connection of clear, peremptory language in a restriction tied to a building code inserts ambiguity into

16

that unambiguous language.[10]  The 29-day occupancy restriction refers to a timeframe for transient occupancy (that which is under 30 days).  The Unit Owners argue that tying the restriction to the then-existing Building Code "amplifie[s]" the ambiguity, but they still fail to explain precisely *what* ambiguity exists to be amplified.  The drafters of the condominium documents wanted to impose a short-term occupancy restriction on the units so that resort guests would have lodging options available when they paid to stay at Blue Harbor's resort.

¶34    The drafters clearly designated that the occupancy timeframe would be 29 days maximum so that the resort would fall within the R-1 Transient Residential designation as it existed at the time.  Even if that occupancy designation was altered after the fact or if the Building Code was later amended, it does not change the clear and precise number of days that a unit owner can continuously stay in their unit.  In fact, the restriction could not be clearer— 29 days is the limit: not one day more.  Once that timeframe passes, the owner can return to the unit for another 29 days.

¶35    Finally, we note that the Unit Owners' ambiguity argument is further belied by their conduct.  There is substantial evidence in the Record that

---

[10] Moreover, the Unit Owners also contend that the underlying Building Code (in particular Section 310.1 Residential Group R) is confusing and anything but clear.  They contend that there is no way to determine whether R-1 or R-2 designations or both apply to a given project.  Frankly, not only is that incorrect, but it is entirely beside the point.  A project is designed with a proposed occupancy designation that the owners seek; the City has to approve that designation.  Simply because a property could be designated as both R-1 and R-2 does not alter the fact that Blue Harbor sought to be designated as R-1; its plans and permits were all designed for that designation, and it *was* designated as R-1.  Again, we do not see the confusion the Unit Owners claim.  Similarly, their argument that the use of the phrase "primarily transient in nature" in the R-1 definition or the lack of specific reference to condominiums does not pose any confusion.  The only reasonable interpretation is that transient occupancy is under 30 days, and 29 days is, clearly, less than 30 days.

demonstrates the Unit Owners knew and acknowledged that the 29-day occupancy restriction was in effect. First, they encouraged the former Board to seek a waiver and release of that restriction from the City and its Redevelopment Authority in January 2021. And, in the retention agreement with an architect, it declares that he was hired "to review the feasibility of converting the existing condominiums from an existing use of R1 to a combined R1/R2 use."

¶36   Given all of these facts, it is clear that the Unit Owners have failed to show that the 29-day occupancy restriction (in either condominium document) was ambiguous. It is clear; it is susceptible to only one reasonable interpretation. That would resolve the first issue, but, this is not the only ambiguity argument made by the Unit Owners.

### C. The 29-day occupancy restriction is reasonable.

¶37   The Unit Owners also assert that the 29-day occupancy restriction is unreasonable and, thus, invalid. With respect to this argument, they concede, as they must, that reasonableness of a restrictive covenant only comes into play when that covenant is ambiguous. *See Solowicz v. Forward Geneva Nat'l*, *LLC*, 2010 WI 20, ¶41, 323 Wis. 2d 556, 780 N.W.2d 111; *Le Febvre v. Osterndorf*, 87 Wis. 2d 525, 533, 275 N.W.2d 154 (Ct. App. 1979) ("[A] restriction on the use of real estate must be reasonable under all of the facts and circumstances."). We have already determined that the restrictive covenant was not ambiguous. Yet, even if it was ambiguous, we conclude it is not unreasonable. The Unit Owners argue that the 29-day occupancy restriction is considered unreasonable, absurd, and even ludicrous because "it has the effect of requiring unit owners to vacate their unit every 29 days, but presumably with the right to return a day, an hour, or perhaps just a minute later to start the 29-day cycle over again."

¶38    Blue Harbor asserts that, like their first ambiguity argument, the Unit Owners present no support for this argument in their initial brief.  Again, reasonableness is only defined in the Unit Owners' reply brief where they make an opening-the-door-to-any-restriction, slippery-slope type of argument as well as complain about changes made to the documents before they were signed.  This argument is not persuasive.[11]  Blue Harbor aptly explains that the 29-day occupancy restriction is entirely reasonable given the nature of the resort itself: it was designed to accommodate resort guests who wanted to be close to the water park complex.  Again, we agree with the circuit court and Blue Harbor.

¶39    "The primary goal in contract interpretation is to 'give effect to the parties' intent, as expressed in the contractual language.'"  *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶22, 326 Wis. 2d 300, 786 N.W.2d 15 (citation omitted).  "We ascertain the parties' intentions by looking to the language of the contract itself."  *Seitzinger v. Community Health Network*, 2004 WI 28, ¶22, 270 Wis. 2d 1, 676 N.W.2d 426; *see State ex rel. Journal/Sentinel v. Pleva*, 155 Wis. 2d 704, 711, 456 N.W.2d 359 (1990).

¶40    From the very start—before any owner purchased their unit—the condominium documents stated that occupancy was only permitted for a period not to exceed 29 consecutive days to allow for resort guests to obtain housing.

---

[11] In support of their argument for unreasonableness, the Unit Owners make much ado about the fact that there are no cases that forbid a condominium owner from continuously occupying their unit.  They also assert that Blue Harbor appears to argue that there are no limits on what restrictions a condominium association may impose.  Both arguments are impractical and cannot withstand scrutiny.  First, there is no evidence that lack of an appellate decision forbidding continuous occupancy would invalidate such a restriction if it were reasonable.  Next, the conclusion that a 29-day occupancy restriction is enforceable does not open the door to *any* restriction ever imagined.  Each restriction will be, and is, reviewed on its individual merits.

This restriction was followed from 2004 until 2011 when the Unit Owners' underlying lawsuit was filed. The Unit Owners now seek to alter the occupancy restrictions they agreed to abide by when they purchased their units, and they ask this court to permit permanent, year-round occupancy as single-family residences: something that was never within their contemplation when they made their purchases. *That* is unreasonable.

¶41 This is akin to purchasing a condominium with the knowledge that no inground basketball hoops may be placed on a driveway, and, then, after a few years, demanding the ability to install such a hoop. None of the Unit Owners were required to purchase these limited-occupancy units. Now, they appear to regret their freely-made decisions and want this court to change the condominium terms after their purchase.

¶42 Interestingly, the restriction in *Le Febvre*, upon which the Unit Owners rely, is the exact opposite of the one herein. There, "the clear intent of the board [and the restriction on the use of the condominium units] was to discourage investment ownership and encourage resident ownership of units." 87 Wis. 2d at 534. That court concluded that "the restriction served a just purpose and protected the legitimate interests of the other unit owners" and that it was, therefore, reasonable. *Id.* at 534-35. Here, the restriction is to discourage resident ownership and to encourage investment ownership. The Blue Harbor restriction, likewise, serves a just purpose and protects the legitimate interests of the other unit owners who, eyes wide open, decided to purchase condominium units in a resort complex that, from its inception, sought to encourage visitor renters.

¶43　It is not for this court to interfere with competent citizens' ability to freely contract.[12]　Our state supreme court, in ***Town Bank v. City Real Estate Development., LLC***, 2010 WI 134, ¶33, 330 Wis. 2d 340, 793 N.W.2d 476, succinctly sets forth this principle:

> This court has long recognized the importance of protecting parties' freedom to contract.　When construing contracts that were freely entered into, our goal "is to ascertain the true intentions of the parties as expressed by the contractual language."　...　"If the contract is unambiguous, our attempt to determine the parties' intent ends with the four corners of the contract, without consideration of extrinsic evidence."　Only when the contract is ambiguous, meaning it is susceptible to more than one reasonable interpretation, may the court look beyond the face of the contract and consider extrinsic evidence to resolve the parties' intent.

(Citations omitted.)

¶44　And, we note that "[i]t is not the function of the court to relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated." ***Ash Park, LLC v. Alexander & Bishop, Ltd.***, 2015 WI 65, ¶38, 363 Wis. 2d 699, 866 N.W.2d 679.　Moreover,

---

[12] We do note that the Unit Owners, in their request for a waiver and release of the 29-day occupancy restriction, outline several purported reasons that they assert compel the removal of the restriction, including that: the units never met their "pro forma net income" projections, there are lower occupancy levels, there are lower rental rates, and the resale prices of the units have "plummeted."　In essence, the investment opportunity has not paid well.　Be that as it may, that, alone, cannot be a basis to overturn a valid contract.　There were also allegations that SRO was not fairly attributing rental opportunities to the non-SRO unit owners.　Again, that is not a basis upon which to terminate a real estate contract with parties *other than* SRO.

On the other hand, SRO and SA contend that removing the 29-day occupancy restriction would cause the City to lose room taxes, and it would, then, likely increase real estate taxes (from the reduced tax rate offered to the condominium owners) to higher residential rates, thus causing SRO and SA to incur a substantial tax liability in their multi-million dollar investment in Blue Harbor.

in this case, the restriction did not *become* more onerous—the Unit Owners were fully aware of the 29-day occupancy restriction when they opted to purchase their units. It was, from the start, a 29-day occupancy restriction, and that has remained constant. If the Unit Owners now regret the bargain they entered into, they have remedies: they can sell their units, or they can elect a friendly majority to the Board and alter or amend the terms of the restriction. They cannot avoid their freely-entered into bargain by claiming unreasonableness of a reasonable restriction. Simply put, if the terms of a condominium declaration are unambiguous, "its terms need not pass a test as to their reasonableness in order to be enforceable." *Solowicz*, 323 Wis. 2d 556, ¶52.

¶45 All in all, the Unit Owners have failed to show that the 29-day occupancy restriction is either ambiguous or unreasonable. We affirm the circuit court on this issue. We next address the Unit Owners' alternate argument.

## II. The Building Code designated the property as "R-1 Transient Residential" occupancy.

¶46 In their second argument, the Unit Owners assert that both of the pertinent Blue Harbor documents assume that there was a Building Code in effect at the time they were executed, and they then extrapolate and argue that nothing in that Code compelled the imposition of a 29-day occupancy restriction. They further argue that, even though the resort was designated under R-1 Transient Residential, it *could have also* been designated as R-2 (primarily permanent occupancy). Finally, they assert that the Redevelopment Authority's vote to remove the 29-day occupancy restriction had legal effect to actually accomplish that removal despite no amendment being drafted and signed, or being memorialized by written Board resolution or by any further written action by any party. In essence, the Unit Owners contend that the 29-day occupancy restriction,

22

when read in conjunction with the Building Code, establishes that the there is no legal basis for a prohibition on continuous occupancy beyond 29 days. Blue Harbor responds that none of these arguments have legal merit. We agree with Blue Harbor and the circuit court.

### A. The property was and is designated R-1.

¶47     There is no dispute by any party that the Blue Harbor condominium property was originally classified as R-1 Transient Residential. There is no dispute that the project's drawings, building permits, and approvals bore the R-1 classification only. And, it is more than likely that all parties would agree that, at some point in the future, the condominium units could be designated as both R-1 and R-2, or even simply as R-2. As Blue Harbor argues, that possibility is absolutely, legally irrelevant. The circuit court aptly noted that the key question was what designation was in place when the units were built and offered for sale.

¶48     In its oral ruling, the circuit court relied heavily upon the affidavit of the City Planner who looked back at the relevant records and averred:

> The Building Permits indicate that the City of Sheboygan approved each Building of the Condominium for an R-1 [T]ransient [R]esidential [U]se. The July 21 Letter and the March 30 Letter [both from the Wisconsin Department of Commerce] state the State of Wisconsin approved each Building of the Condominium for an R-1 [T]ransient [R]esidential [U]se.
>
> The City has no records that it ever approved any occupancy for the [Blue Harbor] Condominium other than R-1 [T]ransient [R]esidential. Thus, the City's records indicate that all Buildings in the Condominium were only approved to be used as an R-1 transient occupancy, and that has been and continues to be their only approved occupancy today.

¶49    Simply because the condominium units could be designated differently by the City after they were built does not mean that they have been, or that the mere possibility of that occurring in the future somehow alters the actual designation when they were built or, more to the point, the terms of the condominium documents relied upon when each unit owner purchased their unit. Future possibilities do not alter existing facts.

**B. The Redevelopment Authority's actions did not alter the R-1 designation.**

¶50    Having conceded that Blue Harbor and their units were originally designated as R-1 Transient Residential since they were built in 2004 and have been so ever since, the Unit Owners contend that the former Board and the City "discovered" that the 29-day occupancy restriction was tied to the Building Code in 2021 and "that no further affirmative action was necessary for the condominium to be in compliance with the City's [B]uilding [C]ode for R-2 continuous occupancy." First, we look askance that this "discovery" took place almost 17 years after Blue Harbor was established, but even if so, the motion to the Redevelopment Authority did not alter the restrictions in the condominium's documents. That would take a written amendment to both documents.

¶51    It is undisputed that in 2021, the former Board, without taking a vote of its owners, requested a waiver and release of the 29-day occupancy restriction from the City and its Redevelopment Authority. It is also undisputed that the Redevelopment Authority ultimately voted, in April 2021, in favor of waiving and removing the 29-day occupancy restriction and "authoriz[ing] Staff to modify any necessary documents to accomplish that waiver/release." But, that action alone did not alter the situation on the ground given several key facts.

¶52     First, at no point in time did the City change the transient occupancy designation for Blue Harbor.  Next, the unilateral actions of the Redevelopment Authority are not sufficient on their own to amend condominium terms and conditions.  Even if the Redevelopment Authority's actions did waive or remove the 29-day occupancy restriction, it was but one of five parties needed to amend the Declaration and one of three parties needed to amend the Amended Restrictive Covenant.  The Redevelopment Authority, pursuant to WIS. STAT. § 66.1335(1), is a separate body politic from the City and it does not have the ability to enter agreements on behalf of the City.  More critically, the Redevelopment Authority never took that next step to actually modify the necessary documents.

¶53     Finally, the Unit Owners' reliance on a letter the former Board's attorney sent out to unit owners (that set out their view that the 29-day occupancy restriction was only implied) is misplaced.  The attorney asserted that the restriction was either ambiguous or unreasonable—precisely the opposite of what we now conclude.  The attorney wrote:

> In the process of reviewing the 29-day Rule, the Board, the City, and legal counsel for both discovered that the alleged 29-day Rule was an implicit restriction instead of an actual restriction and that the 29-day Rule was predicated or preconditioned on units not also being in compliance with owner-occupied residential building codes.  …  As the Board announced at the annual meeting of unit owners on March 3, 2021, the City Redevelopment Authority voted 6-0 to direct the City Attorney to negotiate removal of the 29-day Rule.  The negotiation and review process included a requirement for an independent architect to determine the building modifications required in order for the units to be in compliance with residential owner-occupied building codes.  The architect hired by the Condominium Association confirmed that the units and buildings when built were already in compliance with residential owner-occupied building codes.  …  However, the Board and the City agreed to obtain a vote of the Redevelopment Authority confirming the removal of the 29-day Rule so that there would be a public record and documentation that

continuous occupancy of units was in compliance with building codes and City agreements. The City took this action and confirmed this removal of the 29-day Rule on April 14, 2021.

¶54 There are multiple legal infirmities in that letter[13] that establish why it is not a sufficient basis upon which a court could conclude the restriction is unenforceable. First, the "discover[y]" by the former Board's former attorney that the 29-day occupancy restriction is not mandatorily enforceable is solely that attorney's opinion and carries very little weight in this appeal. Second, Blue Harbor has been and remains designated as R-1 Transient Residential—that means that occupancy of the condominium units cannot exceed 30 days. The Unit Owners bore the burden to establish that the occupancy designation was changed, not merely that it *could* be changed. There is unrefuted evidence by the City Planner that that change has not taken place.

¶55 Next, the Redevelopment Authority is only one of the signatories on the Declaration and the Amended Restrictive Covenant, and all are required to approve the removal of or change to a restriction. More to the point, the action by the Redevelopment Authority was never fully carried out. The minutes of its meeting state:

> Motion ... to grant a waiver and release of the limitation of continuous occupancy at the Blue Harbor Condominiums and authorize Staff to modify any necessary documents to accomplish that waiver/release. Motion carried.

---

[13] Blue Harbor raises concerns over the admissibility of the letter from the former Board's attorney. The Unit Owners object that that hearsay argument was first raised on appeal. We need not address the argument because it does not impact the legal effect of what the Redevelopment Authority did or did not do in April 2021.

¶56 There is no evidence in the Record that the Redevelopment Authority took any steps to modify "any necessary documents to accomplish that waiver/release." Without such proof, the Unit Owners cannot establish that even the Redevelopment Authority amended the condominium documents despite an apparent intention to do precisely that. But, intentions do not alter legal documents when written amendments are required. *See Central Auto Co. v. Reichert*, 87 Wis. 2d 9, 19, 273 N.W.2d 360 (Ct. App. 1978) ("If the intent can be determined with reasonable certainty from the face of the contract itself, there is no need to resort to extrinsic evidence."); *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶48, 283 Wis. 2d 555, 699 N.W.2d 205 ("[P]arties are expected to negotiate and will be held to their agreements, as required by the law of contract.").

¶57 The Declaration provides the means by which it can be amended. That requires, pursuant to Section 17.1, "the agreement of the City, the [Redevelopment] Authority, the Managing Agent, the Condominium Lender and the Unit Owners having at least eighty percent (80%) of the votes in the Association ... ." Each unit owner who has a mortgage must also first obtain the written consent of all mortgagees. Likewise, the Amended Restrictive Covenant, in Section 18(c), sets forth the method for its amendment, but cautions that "[n]o waiver, amendment, or variation in the terms of [the Amended Restrictive Covenant] shall be valid unless in writing and signed by the City, the [Redevelopment] Authority and [Blue Harbor], and then only to the extent

specifically set forth in writing."  No such written amendments have ever been offered to or signed by the Board.[14]

¶58     In order to amend or change (including waive or remove) any of the restrictions within those documents, it is clear that the other signatories must agree in writing.[15]  The Unit Owners have produced no evidence that the City has agreed to alter, amend, or waive any of the restrictions in the condominium documents. To the contrary, as late as April 11, 2024, the City (through its City Planner) averred that Blue Harbor is still designated as R-1 Transient Residential and that the Declaration and Amended Restrictive Covenant are still recorded documents.

¶59     The Unit Owners never produced any written document that memorialized that the former Board had agreed to amend the condominium documents other than the letter sent to the unit owners.  The condominium documents have been recorded.  The Unit Owners have produced no documents showing that new provisions, terms, or amendments have been recorded with the City.

¶60     As with their first argument, the Unit Owners fall far short of establishing that the 29-day occupancy restriction was—in fact and for legal effect—altered or amended.  Without that proof, and despite the intention to do

---

[14] The current Treasurer of the Board estimates that at least 38 of the 64 unit owners (or 59%) favor keeping the 29-day occupancy restriction.

[15] We also note that the Redevelopment Authority's actions were never memorialized in any writing other than its minutes.  The Unit Owners did not provide an affidavit on behalf of the Redevelopment Authority or any other document that indicates that the Declaration and Amended Restrictive Covenant had been amended or otherwise altered.  The Unit Owners bore that burden of proof; they failed to meet it here even as to this one entity.

that, the restriction remains in full force and effect. The circuit court did not err when it concluded the same and issued its declaratory and summary judgment.

## CONCLUSION

¶61 The 29-day occupancy restriction in Blue Harbor's Declaration and Amended Restrictive Covenant is clear, unambiguous, and set forth in peremptory terms. It is reasonable, and its purpose, to encourage visitors at the water-park resort and support the investment-owner strategy, is readily discernable. The Unit Owners freely bargained for the purchase of their condominium units with the clearly-designated temporal restriction.

¶62 Neither the language in the Building Code nor the initial steps taken by the Redevelopment Authority to waive or remove the 29-day occupancy restriction have any legal effect upon the restriction's validity, nor have the terms of the Declaration and/or Amended Restrictive Covenant been amended. The 29-day occupancy restriction is valid and enforceable. The Unit Owners have failed to meet their burdens of proof on appeal, and we affirm the circuit court's order granting summary and declaratory judgment to Blue Harbor.

*By the Court.*—Order affirmed.

Recommended for publication in the official reports.